**KURT H. VOLK, INC., Plaintiff,**

v.

**FOUNDATION FOR CHRISTIAN LIVING, Defendant.**

No. 76 Civ. 5611 (CHT).

United States District Court,
S. D. New York.

Feb. 25, 1982.

Davis, Hoxie Faithfull & Hapgood, New York City, for plaintiff; Thomas E. Spath, Stanley L. Amberg, Robert H. Fischer, New York City, of counsel.

Blum, Kaplan, Friedman, Silberman & Beran, New York City, for defendant; Harold I. Kaplan, Steven B. Pokotilow, Randy Lipsitz, New York City, of counsel.

## OPINION

TENNEY, District Judge.

In this action for patent infringement defendant Foundation for Christian Living ("FCL") is charged with infringement of U.S. Letters Patent No. 3,920,267 for multiple folding booklets ("the suit patent") which issued on November 18, 1975 to Randolph S. Lyon, Jr. ("Lyon"), an employee of plaintiff Kurt H. Volk, Inc. ("Volk"). Volk is the owner by assignment of the suit patent.

FCL has answered by denying infringement and by asserting the affirmative defenses of invalidity and equitable estoppel. It has also counterclaimed for a declaratory judgment of invalidity and non-infringe-

ment of the suit patent, and further that FCL has an equitable license to practice the invention described and claimed in the suit patent.

The issues of patent validity, non-infringement, and equitable license were presented during a bench trial before this Court on March 4–10, 1981. After careful consideration of the evidence and of the post-trial briefs of counsel the Court concludes that Volk cannot prevail on any of the issues in this case, and that FCL is entitled to the affirmative relief it seeks, including an award of attorneys' fees in defending this action.

I

A. *Preliminary History*

Although the history of the dispute giving rise to this litigation commences in early 1970 it is necessary to look further to the past to delineate the nature of the relationship between the parties. Plaintiff Volk is a Connecticut corporation engaged in the commercial printing business and located in Milford, Connecticut. Defendant FCL is a nonprofit church corporation of the State of New York with offices located in Pawling, New York. It was formed about forty years ago at the Marble Collegiate Church in New York City by the Reverend Dr. Norman Vincent Peale, the pastor of that Church.

For many years prior to 1970 FCL had, during ten months of the year, distributed to subscribers throughout the United States and the world three individual twelve-page sermon booklets, authored principally by Dr. Peale. Pl. Exh. 49. These three individual booklets each contained a single sermon or was based on a single concept. The individual booklets were printed by Volk in Connecticut and shipped to FCL's offices in Pawling, New York where the three separate booklets were inserted into an envelope, addressed and mailed to subscribers. The primary reason for sending three individual sermon booklets to each recipient was to allow the recipient, after reading the booklets, to pass any one or all of the booklets to a friend or relative who might be interested.

During the early 1950's, Volk became the exclusive printer of the sermons distributed by FCL, and a close personal as well as business relationship grew between Dr. Peale, on the one hand, and the father and grandfather of the present president of Volk, Kurt E. Volk Jr. ("Volk Jr."). Indeed there is a plaque on public display at FCL's offices in Pawling honoring Volk Jr.'s father and grandfather.

FCL's subscriber list grew so dramatically over the years that the handling of the three separate sermon booklets and their insertion into envelopes for mailing during each of ten months during the year became an increasing burden on FCL's personnel and existing machinery. By 1969 the subscriber list had increased to over 400,000, and FCL ran into considerable difficulties in completing the handling and mailing of the three separate sermons to its subscribers in a timely manner. Since FCL receives its funding from voluntary contributions by its readers, the continuing success of the venture was extremely important to it.

FCL's problem in completing the monthly sermon mailings was communicated to Volk Jr. in 1969 on several occasions by Myron L. Boardman, the Executive Director of FCL, ("Boardman"). Boardman, who was aware of the existence of self-mailers not requiring separate envelopes, asked if there was some way that the three sermons could be kept together in a form that would not require insertion in an envelope.

Sometime in late 1969 or early 1970 Randolph S. Lyon Jr. ("Lyon"), the named inventor of the suit patent, heard about the problem from a customer service representative of Volk who had been in communication with Boardman. Lyon, in early 1970, developed several prototypes or unprinted mock-ups of a three-in-one format wherein the booklets were joined together by lines of perforations and folded so that they could be mailed without an envelope. Each mock-up was fabricated manually by folding a piece of paper and using a ruler and razor to simulate perforations. The three-

in-one format was designed by Lyon in several hours. These unprinted mock-ups were of the same three-in-one structure described in the suit patent. Lyon showed the unprinted mock-up to Volk Jr. who made an appointment to meet with Boardman at FCL's Pawling headquarters. Lyon prepared similar additional unprinted mock-up three-in-one booklets and on March 26, 1970 Lyon and Volk Jr. met with Boardman to show him the booklets.

Boardman was impressed with the three-in-one format as a potential solution to FCL's self-mailing problem, and FCL ordered from Volk a test quantity of 500 monthly sermons in that format for the May 1970 issue, for which Volk charged FCL $821.00 or $1.64 per booklet in addition to charging FCL the usual cost for its May printing of the individual twelve-page booklets. It is not clear whether these 500 were actually mailed or whether, as appears more likely, the test run was to determine whether the booklets could be printed properly in quantity and whether they could be separated. In any event, this preliminary test proved successful and FCL ordered 50,000 for the June issue for which Volk charged 4¢ per booklet. These three-in-one booklets were mailed to readers on FCL's mailing list without any letter or explanation. After no complaints were received from the recipients FCL knew that it had a format that was acceptable. Accordingly, it ordered 510,000 of the three-in-one booklets from Volk for September, 535,000 for October, 463,000 for November, 515,000 for December 1970 and 322,000 for February 1971. There was no mailing for January 1971, and Volk did not produce any booklets for FCL after February 1971.

The reason for the termination of the business arrangement between Volk and FCL is quite clear. It had nothing to do with the quality of the work done by Volk but with the price Volk charged for the new format. It is true that any experimental costs incurred by Volk in the development of the three-in-one booklet were not charged with the initial orders for 500 in May 1970 and for 50,000 in June, and probably not for the third order of 510,000 for

September 1970. The cost of the 500 booklets order was approximately 4¢ per booklet, and for the 510,000 order was approximately 3¢ per booklet. There is direct evidence that a total of $1,289.00 of experimental charges were absorbed by Volk. Lyon also testified to other costs incurred in modification of the folding machine and the purchase of a timed hot melt glue system. According to Lyon, the total expenses ran between $7,500–$8,500. Most of this would appear to be costs incurred after the "invention" rather than in devising it.

However, at least as early as August of 1970 Volk Jr. believed that Volk should receive more for the new format, particularly since he felt that FCL would benefit by a reduction in the cost of envelopes, handling, stuffing, and possibly mailing charges. Accordingly he raised the charges to FCL. Although FCL had expected, on the basis of conversations with Volk Jr., that the monthly billing would increase by about $2,000 per month, the proposed increases went well beyond that figure. Def. Exhs. J and M. Therefore, FCL, which had dealt solely with Volk over the years, decided to find out what could be done with competitive bidding. Based on bids received from various printers, FCL ascertained that Volk was charging about $6,000 more per month for each printing run of the three-in-one format than other qualified competitive bidders. These price comparisons were presented to Volk and FCL asked Volk not necessarily to meet the price of the lowest responsible bidder but at least to approach that price in order to keep FCL's business. Volk refused and indicated that the price would be further increased.

After consultation with Dr. Peale, FCL determined that the difference of approximately $6,000 per month was too great to be absorbed by a nonprofit organization funded solely by charitable contributions, and that unless Volk showed some willingness to compete, FCL would be forced to turn to other printers. On December 30, 1970 FCL wrote to Volk Jr. terminating the business relationship as of March 1, 1971. Def. Exh. OO. However, on January 12,

1971 FCL made one final request of Volk to lower its prices. Volk refused and told FCL to take its business elsewhere. Def. Exh. Y. On March 19, 1971 a patent application was filed in Lyon's name, directed to the three-in-one booklets then being distributed by FCL but printed by a new printer.[1]

FCL was never advised that a patent application had been filed, nor was it advised of the issuance of a patent until May 25, 1976, more than six months after its issuance on November 18, 1975. In its letter of May 25, 1976 Volk charged FCL with infringement and offered it a nonexclusive license to practice the invention. Pl. Exh. 22; Def. Exh. RR. Further communication established that the license would amount to $12.00 per 1000 pieces which figure was "not negotiable." Pl. Exhs. 24, 25. FCL declined to take a license under the patent. Pl. Exh. 27.

At the time the notice of infringement was received, City Printing of North Haven, Connecticut was manufacturing the three-in-one booklets for FCL in the same original format that Volk had introduced to FCL. In September 1976, after receiving the notice of infringement, FCL had City Printing modify the folding format of the three-in-one format for the purpose of avoiding infringement of the claims of the suit patent. However, on December 17, 1976 Volk commenced this action against

FCL for patent infringement of the suit patent. FCL admits that its prior version of the three-in-one booklet meets each and every limitation of the suit patent. In fact, it is FCL's position that the claims presented during the prosecution of the suit patent are "picture claims" specifically drawn to capture the original three-in-one format used by FCL.

B. *The File Prosecution History*

The Lyon application filed on March 19, 1971 was assigned Serial No. 125,937 (the "original application"). Pl. Exh. 1–B. As filed, the original application contained eight claims. Independent claims 1 and 5, and dependent claims 2, 3 and 4 were the only article claims contained in the application, as filed. Additionally, independent method claims 6 and 8 and dependent claim 7 were the only method claims presented in the original application as filed.[2]

The original article claims presented on March 19, 1971 were as follows:

1. An article of manufacture comprising folding multiple booklets, independently separably joined along the edges of the pages of those booklets lying adjacent and intermediate to the end booklets.

2. The invention of claim 1 where the multiple booklets are separably joined along lines parallel to the centerfold lines of said booklets.

---

1. Since the application was assigned by Lyon to Volk, the plaintiff herein, the latter's name will be used in connection with the Patent Office history rather than Lyon's

2. The original method claims were:
6. A process for producing multiple booklets independently separably joined along the edges of the pages of booklets lying adjacent and intermediate to the end booklets which comprises:
(a) aligning sheets which constitute the booklet pages,
(b) scoring said sheets along the centerfold line of each of said multiple booklets,
(c) binding said sheets to each other along said centerfold line of each of said multiple booklets, and
(d) perforating said sheets intermediate and parallel to said centerfold lines, thereby forming multiple booklets which are predisposed to folding along said centerfold lines and said lines of perforation.

7. The method of claim 5 wherein said aligned sheets are formed from one integral sheet and which includes the additional step of separating said aligned sheets.
8. A process for producing multiple booklets independently separably joined along the edges of the pages of booklets lying adjacent and intermediate to the end booklets which comprises:
(a) aligning sheets which constitute the booklet pages,
(b) binding said sheets to each other along the centerfold line of said multiple booklets,
(c) perforating said sheets intermediate the top and bottom margins of adjacent booklet pages perpendicular to said centerfold line,
(d) and scoring said sheets along said centerfold line thereby forming multiple booklets which are predisposed to folding along said centerfold lines and said lines of perforation. . .

3. The invention of claim 1 where the multiple booklets are separably joined along lines perpendicular to the center-fold lines of said booklets.

4. The invention of claim 1 where said multiple booklets are made independently separable by means of slit perforations.

5. An article of manufacture comprising folding multiple booklets, independently separably joined along the edges of the pages lying adjacent to each other.

Thus it appears that article claims 1 through 5, as originally filed, defined multiple folding booklets, independently separably joined along the edges of the pages lying adjacent to each other. However, it is apparent from the application language thereof that the specific manner in which these booklets are constructed and folded was *not* recited in original article claims 1 through 5. Significantly, at trial, Lyon testified that his invention consisted of "multiple folding booklets whose panels are separated by perforations and when these panels, the backbones of the panels have been glued and the panels are folded into position so that the backbones of the booklets are aligned and then all the books all together are folded into a compact nesting which becomes a self-mailer ready to put in the mail with addressing only." Tr. at 299. One can only conclude that the original article claims 1 through 5 were clearly of a scope different from the description of what Lyon claims to have been his invention. This was due, in great measure, to Volk's haste to file before the invention had been in the public domain for over a year, a matter we will direct our attention to hereinafter.

In any event Volk, some ten months after the original patent application was filed, petitioned on January 12, 1972 to make the application special, *i.e.*, to have it examined early, which petition was granted on March 7, 1972. In the papers supporting this petition, the assignee Volk claimed that one of the factors that permitted a successful bidder to supply FCL with three-in-one booklets at a lower price was "the unfair advantage taken of the efforts and investments made by the Assignee (Volk) in developing the instant invention." Pl. Exh. 1–B, Paper No. 3, p. 4. Considered in the fairest light possible, this statement was completely inaccurate. Indeed, Lyon so admitted at trial. Tr. at 274. Volk was charging some $6,000 per month in excess of the competitive bidders. The "efforts and investments . . . in developing the instant invention" never exceeded $7,500–$8,500, only a portion of which was substantiated by the evidence. Volk could therefore have recovered these expenses in the final few months of the contract. Furthermore, it seems clear to this Court that Volk was not seriously concerned with either utilizing the "invention" itself or in licensing it to anybody but FCL.

Following the grant of a special application on March 7, 1972 a first office action was issued by the examiner on April 18, 1972. Pl. Exh. 1–B, Paper No. 7. The examiner *rejected all of the claims* in the application, *i.e.*, the original article claims 1 through 5 and the original method claims 6 through 8 *as being vague and indefinite under 35 U.S.C. § 112.* He also found this disclosure inadequate under the same provision. Additionally the *original article claims 1 through 5*, as filed, were rejected *under 35 U.S.C. § 102 as being anticipated by the prior art*—claims 1, 4 and 5 by Cooper Patent No. 1,330,786 or Brown Patent No. 1,738,633 or Snyder Patent No. 1,904,690, Def. Exhs. CC, DD, and EE, each of which discloses booklets separably joined together; claim 3 by the Cooper or Brown patents; and claim 2 by the Snyder patent. Worded more succinctly, the examiner specifically and expressly found that each and every feature presented in the original article claims 1 through 5 were found in at least one individual prior art reference and, hence, the invention as originally claimed by Lyon, *i.e.*, multiple booklets, separably joined, lacked any novelty with respect to the prior art.

In response to this rejection, Volk filed an amendment on June 26, 1972 cancelling all of the original claims in the application and adding new article claims 9 through 12. Pl. Exh. 1–B, Paper No. 8–A. Claims 1

through 4 in the suit patent are based, with certain significant modifications hereinafter referred to, upon claims 9 through 12 presented in this amendment filed more than two years after the three-in-one format had entered the public domain through its sale to FCL in April of 1970. There is no question in the Court's mind that these claims 9 through 12 were added to avoid the cited prior art. They were strictly limited to the specific construction of the booklets and the specific manner of folding them into a nesting relationship. Moreover, these newly added or substitute claims, as will be shown hereinafter, substantially differ in scope from the originally presented claims.

Despite the substantial difference noted, the examiner, in a final rejection dated August 28, 1972, rejected all of the new claims 9 through 12 under 35 U.S.C. § 103 as being obvious over Phillips *et al.* Patent No. 1,975,660, taken in combination with either Swanson Patent No. 1,567,875, Ewen British Patent No. 19,439 or Fladmark Patent No. 1,852,963. Pl. Exh. 1–B, Paper No. 9; Def. Exhs. II, KK, LL, and MM.

In response to this final rejection, Volk filed a document entitled "Amendment After Final Rejection" on January 2, 1973. Pl. Exh. 1–B, Paper No. 12. In it, Volk amended the preamble in claims 9 and 10 to adopt the "self-mailable unit" language, and further amended the transition clauses in claims 9 and 10 from "comprising" to "consisting of." The transition phrase is the introductory clause between the preamble and the limitations of a claim and, as will be considered hereinafter, clearly affects the scope of protection afforded by the claim language.

The examiner refused to enter the "Amendment After Final Rejection" and, as a result, this application was abandoned in favor of Continuation Application No. 336,453 ("continuation application") which was filed on February 28, 1973.

The continuation application was preliminarily amended to contain the same claim language that was requested to be considered after the final rejection of the original application. Pl. Exh. 1–A, Paper No. 2½–B. On August 20, 1973, all of the claims (9 through 12) were rejected under 35 U.S.C. § 112 as indefinite and under § 103 as unpatentable over Phillips *et al.*, in view of Swanson or Fladmark or Ewen, or over Cooper in view of Swanson or Fladmark.[3] Pl. Exh. 1–A, Paper No. 3. Following this final rejection of the continuation application, Volk on November 9, 1973 sought further amendment of the application, allegedly in order to present the rejected claims in better form for consideration on appeal. Pl. Exh. 1–A, Paper No. 4–C. The amendments were limited to the following: the addition of the words "*permanently* bound" in 9(f) and 10(f); the interposition of the phrase "*by two lines of perforations transverse of the web*" in 10(b) and the phrase "*transverse of the web*" in 10(e); and, in 10(f), the change of "*a* centerfold line" to "*the* centerfold line" and the change of "adjacent layers" to "*sub* -adjacent layers." (Emphasis added.)

On November 21, 1973, the examiner allowed the amendments on appeal. Pl. Exh. 1–A, Paper No. 5. Thereafter, on November 28, 1973, Volk appealed to the Patent Office Board of Appeals. Pl. Exh. 1–A, Paper No. 6. In view of the filing entitled "Amendments After Final Rejection," which had been filed on January 2, 1973 and made part of the continuation application, the examiner in his answer withdrew his rejection of the claims under 35 U.S.C. § 112 as vague and indefinite, as well as his rejection under § 103 as anticipated by the prior art over Cooper in view of Swanson or Fladmark. The examiner stated, however, that claims 9 through 12 must still be rejected as unpatentable over Phillips *et al.*, in view of Swanson or Fladmark or Ewen, for the reasons set forth in his final rejections of the continuation application on August 20, 1973. Pl. Exh. 1–A, Paper No. 8.

**3.**

| | | |
|---|---|---|
| Cooper Patent No. | 1,330,786 | Def. Exh. CC |
| Phillips Patent No. | 1,975,660 | Def. Exh. II |
| Swanson Patent No. | 1,567,875 | Def. Exh. KK |
| Fladmark Patent No. | 1,852,963 | Def. Exh. LL |
| Ewen British Patent No. | 19,439 | Def. Exh. MM |

The ex parte hearing before the Patent Office Board of Appeals took place on April 22, 1975. The Board forwarded its opinion on July 11, 1975. Pl. Exh. 1–A, Paper No. 12. As stated in that opinion, "[t]he primary question raised by the rejection of the claims is whether or not the Phillips *et al.* patent discloses interconnected *booklets* each of which is formed by sheets of printable material secured together *along* a centerfold line of such sheets." (Emphasis in original.) The Board concluded that:

Although the secondary references to Swanson, Fladmark and Ewen disclose folding multiple layers of sheet material about a center line they do not make obvious the proposed modification of the Phillips *et al.* construction advanced by the examiner. The concept of making a self mailable unit, consisting of folding booklets interconnected by tearable lines, in the manner recited in the claims, is found only in the instant disclosure. We fail to see how one, *armed with the prior art submitted by the examiner*, would find it obvious to combine such art to produce the instant invention. Accordingly, the rejections of claims 9, 10, 11 and 12 made under 35 USC 103, as unpatentable over such art, will not be sustained.

(Emphasis added.)

The decision of the examiner was accordingly reversed, and the application matured into U.S. Patent No. 3,920,267 which issued on November 18, 1975. Pl. Exh. 1. It is clear from the file wrapper, however, that the Board of Appeals only considered the several prior art patents cited above, and as will be explained in some detail hereinafter, did not consider well-known folding, gluing, perforating and cutting techniques that were used in the printing and bindery industry for over fifty years prior to the filing of the original application by Volk.

II

*Analysis of the Issues*

The suit patent issued on November 18, 1975. FCL admits that its prior version of the three-in-one booklet meets each and every limitation of the suit patent claims which FCL argues are in fact "picture claims" specifically drawn to capture its original three-in-one format.

Volk's burden in its infringement suit would appear to be satisfied initially by the presumption of patent validity under 35 U.S.C. § 282, coupled with proof that the modified booklet did indeed infringe the suit patent. However, the Court will first consider FCL's defenses and claims for affirmative relief because they relate to the validity of the suit patent and may be dispositive of Volk's claims herein. Thereafter the Court will discuss attorneys' fees. The issues in this case may be summarized as follows:

A. *Validity Issues*

1. *Obviousness.*—Are all of the claims in the suit patent (*i.e.*, claims 1, 2, 3, and 4) invalid under 35 U.S.C. § 103 by reason of the fact that, to a person having ordinary skill in the art to which the subject matter pertains, the differences between the subject matter of the claims and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made?

2. *Late Claiming.*—Are such claims invalid under 35 U.S.C. § 102(b) for late claiming because claims of a different scope, directed to an essentially different invention from the one defined in the claims originally presented, were not introduced into the original patent application, or because there was inadequate disclosure of the invention, until more than one year after the three-in-one booklets were placed on sale or offered for sale?

B. *Infringement Issues*

C. *Equitable License*

D. *Award of Attorneys' Fees Under 35 U.S.C. § 285*

A.1. *Obviousness*

The test for "obviousness" is set forth in 35 U.S.C. § 103 as follows:

A patent may not be obtained though the invention is not identically disclosed or

described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. In *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the Supreme Court outlined a tripartite factual evaluation to be made by the courts in determining validity under § 103, under which courts must determine:

(a) the scope and content of the prior art;

(b) the differences between the prior art and the claims at issue; and

(c) the level of ordinary skill in the pertinent art.

*Id.* at 17, 86 S.Ct. at 693.

In the instant case the claims are directed to a combination of old elements such as paper, folding, perforations and glue. Therefore, the Court must review the question of obviousness with particular care, *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 281, 96 S.Ct. 1532, 1537, 47 L.Ed.2d 784 (1976); *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.*, 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950); *General Radio Co. v. Kepco, Inc.*, 435 F.2d 135, 137 (2d Cir. 1970), *cert. denied*, 402 U.S. 1008, 91 S.Ct. 2189, 29 L.Ed.2d 430 (1971), and the result of the combination must be synergistic, that is, "result in an effect greater than the sum of the several effects taken separately." *Sakraida v. Ag Pro, Inc., supra*, 425 U.S. at 282, 96 S.Ct. at 1537; *accord Anderson's-Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969); *Digitronics Corp. v. New York Racing Assn., Inc.*, 553 F.2d 740, 747-48 (2d Cir.), *cert. denied*, 434 U.S. 860, 98 S.Ct. 187, 54 L.Ed.2d 133 (1977); *cf. Champion Spark Plug Co. v. Gyromat Corp.*, 603 F.2d 361 (2d Cir. 1979), *cert. denied*, 445 U.S. 916, 100 S.Ct. 1276, 63 L.Ed.2d 600 (1980).

The ultimate question of patent validity and therefore, of obviousness, is one of law.

*Sakraida v. Ag Pro, Inc., supra*, 425 U.S. at 280, 96 S.Ct. at 1536; *Julie Research Labs., Inc. v. Guildline Instruments, Inc.*, 501 F.2d 1131, 1136 (2d Cir. 1974). Because a patent is vested with a substantial economic and public importance, the standards of patentability are rigorous and are to be carefully and strictly applied. *Anderson's-Black Rock, Inc. v. Pavement Salvage Co., supra*, 396 U.S. at 62, 90 S.Ct. at 308; *Lemelson v. Topper Corp.*, 450 F.2d 845 (2d Cir. 1971), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1253, 31 L.Ed.2d 456 (1972). However, in determining whether the new development was nonobvious we must, of course, be careful to resist the temptation of simply filtering the new invention through the lens of hindsight.

Finally, the presumption of validity granted patents by 35 U.S.C. § 282 is of small comfort to Volk in the instant case. In this circuit, the presumption means only that reasonable doubts will be resolved in favor of the patentee. *Lemelson v. Topper Corp., supra*, 450 F.2d at 849. This presumption is nearly eliminated where, as here, the court has before it evidence of prior art techniques not considered by the Patent Office. *Julie Research Labs., Inc. v. Guildline Instruments, Inc., supra*, 501 F.2d at 1136; *Lerner v. Child Guidance Prods. Inc.*, 406 F.Supp. 560, 563 (S.D.N.Y. 1975), *aff'd*, 547 F.2d 29 (2d Cir. 1976); *Lorenz v. F. W. Woolworth Co.*, 305 F.2d 102, 105 (2d Cir. 1962).

Mindful of the foregoing, we proceed to a determination of the issue of obviousness employing the tripartite factual evaluation mandated by *Graham*.

(a) *The scope and content of the prior art*

The prior art as established by the evidence herein which must be considered on the obviousness issue includes the patents considered by the examiner during the prosecution of the suit patent, Def. Exhs. CC to MM, only four of which were cited by the examiner to the Patent Office Board of Appeals, Def. Exhs. II, KK, LL, and MM; two patents not considered by the Patent

Office, Def. Exhs. AA and BB;[4] as well as the testimony of the inventor Lyon on the prior art of bindery and techniques; the testimony of Volk's printing and bindery expert George E. Lawrence; and the testimony of FCL's technical experts Shimen Zudekoff and William Damato; together with the physical evidence, including the file history of the suit patent. Pl. Exhs. 1–A and 1–B. The file history, indeed the entire record, makes clear that, during the prosecution of the suit patent, the examiner only considered prior patents represented by Defendant's Exhibits CC through MM, and that no consideration was given to the existing manufacturing techniques employed by the printing and bindery industry prior to 1970.

In determining the prior art as it existed at the time of the invention such determination is not limited to the examination and analysis of existing domestic or foreign patents. "The prior art is all of that knowledge that would have been available to any person having ordinary skill in the art. This hypothetical person of ordinary skill is not deemed to be omniscient, but he must be assumed to share the knowledge available in his art (to persons of ordinary skill) wherever it may originate." *Steelcase, Inc. v. Delwood Furniture Co.*, 578 F.2d 74, 79 (5th Cir. 1978). As stated in *Digitronics Corp. v. New York Racing Ass'n, Inc., supra*, 553 F.2d at 745:

> In determining the scope of the relevant prior art with which the hypothetical ordinarily skilled person must be presumed to be familiar, we hold simply that the court must look, in light of both the training of the patentee and the elements in the claimed invention which give it its novel quality, at what arts the patentee could reasonably be expected to consult in doing the inventing.

(Citations omitted.)

Testimony at trial established that the three-in-one format, as defined in the claims of the suit patent, represents a bindery, printing and book-folding problem. In 1969, and for many years prior thereto, buckle folding machinery was utilized to manufacture folded booklets from printed sheets. Companies that manufactured buckle folding machinery included Baumfolder (a division of Bell & Howell), Cleveland, Stahl and Dexter. In 1969, Volk had both a small Baumfolder buckle folder and a large Cleveland buckle folder at its facility. Buckle folders are machines that include fold plates that are selectively activated in order to fold paper as desired, glue pots for permitting glue (or paste) to be selectively placed on the paper during the folding operation and cutting or perforating wheels that permit the paper to be cut and/or perforated during the folding process.

It may help to explain the process which transforms a sheet of paper into a book or booklet, utilizing a buckle folding machine, a process clearly contemplated by the specifications of the suit patent. For this purpose we will look to the buckle folding machine manufactured by the Baumfolder Division of Bell & Howell, more particularly the Model 433 folder. Def. Exhs. K–1 and K–2. One or more unidentified models of the Baumfolder buckle folder were operated by Volk at all times pertinent to this action.

A buckle folding machine is limited in its operation to folding, gluing or pasting, scoring, and perforating the sheets (or rolls of paper) which are fed into the machine. If a printed book or booklet is involved, the back and front of the sheet of paper must be printed before it enters the buckle folder. The positioning of the printing plates will depend on the number of pages of the book or booklet and the manner of folding the sheet into leaves (the front and back of which will constitute pages). The fold of the sheet will be effected by the selection of fold plates to be activated in the folding process. These fold plates buckle the sheet into rollers on the machine which effect the folding. Buckle folding machinery is accompanied by an imposition manual which

---

**4.** Johnson Patent No. 2,136,343 Def. Exh. AA
 Johnston Patent No. 2,143,625 Def. Exh. BB

instructs the operator as to the positioning of the book or booklet and the selection of the fold plates to be used, so that after folding, the pages of the finished product will lie in the proper sequence and position. In illustrating the process, we will utilize the Baumfolder Imposition Manual, which was apparently issued with the Baumfolder Buckle Folder Model 433. Def. Exh. K–3.

In describing the process, we must assume, as hereinbefore indicated, that a 36-page format is involved. Indeed, Lyon so conceded at trial. This is quite clear, since the total pagination of the three-in-one booklets is 36 pages, and the booklets are paginated 1–12, 13–24, and 25–36. When we examine the Baumfolder Imposition Manual, we find only two references to a 36-page book (not booklet), namely Impositions # 130 and # 131. Def. Exh. K–3. With respect to the fold plates required, # 130 specifies fold plates # # 1, 2, 5, 6, and 9, and # 131 specifies plates # # 1, 2, 5, 6, and 8. In Model 433, # 1 and # 3 are up plates, and # 2 and # 4 are down plates in the parallel folding section of the machine. Tr. at 409. Up plates buckle the sheet up, while down plates buckle the sheet down. Plates # # 5, 6, and 7 are in the first right angle section, while plates # # 8 and 9 are in the second right angle section. Def. Exh. K–3. Plates # # 5 and 7 are up plates and # 6 is a down plate. Tr. at 414. In the second right angle section, plate # 8 is an up plate, and # 9 is a down plate. Tr. at 416; Pl. Exh. 51.

The suit patent does not define in its claims the initial parallel folding of the sheet (or web) but only refers to "an elongated web of printable material *comprising a plurality of layers.*" Claims 1(a) & 2(a) (emphasis added). This is of some significance and explains the difficulties encountered at trial in preparing demonstrative exhibits based on the folding requirements set forth in the Baumfolder Manual for a 36-page book. *i.e.*, Def. Exh. K–3, Impositions # 130 and # 131. The parallel folding which created the "plurality of layers" described in the suit patent specifications, but not claimed, was not by use of plates # 1 and # 2 as specified in the Baumfold-

er Manual, *i.e.*, by an up plate and a down plate, but by two up plates, *i.e.*, # 1 and # 3. This is made clear by Figures 6 and 7 of the specifications of the suit patent which show a fold identical to the six page standard fold in Imposition # 3 of the Baumfolder Manual which calls for the use of fold plates # 1 and # 3. Use of fold plates # 1 and # 2 would produce a zig-zag fold, as shown in Imposition # 4 of the Manual. A zig-zag fold would not produce a plurality of layers that were glued together along their centerfolds, as noted hereinafter.

Although the method of folding to produce the "plurality of layers" might appear inconsequential, this is hardly so when one considers the claims of the suit patent which are supported by the specifications. The suit patent calls for a sheet of paper (or web) "sub-divided by two lines of perforation transverse of the web into three booklet panels each being of the same size." Pl. Exh. 1, Claim 2(b), Figure 6, lines 11 and 13. Furthermore, each layer of each panel is "permanently bound to each subadjacent layer along the centerfold line of each panel." *Id.*, Claim 1(f), Figure 6, lines 10, 12, and 14. Accordingly, the hot glue binding the centerfolds of each layer must be applied prior to the parallel folding of the sheet. According to Figure 6, the glue is applied at the centerfold lines 10, 12, and 14 before the parallel folding, and such folding must be through the use of fold plates # 1 and # 3, not plates # 1 and # 2, which would not have effected the bonding of the layers. Whether the perforations between the booklets are accomplished before or after the parallel folding would not appear important, although the specifications indicate that this is also done at the time the glue is applied.

After the parallel folding, the folded sheet (web) "comprising a plurality of layers" moves on a series of rollers which carry it into the first right angle section of the buckle folder. It is important to recognize that at this time the folded sheet consists of three connected open booklets each with a spine or backbone which has now been

sealed with glue, and that these booklet panels are separated by perforations. In other words the panels could be separated at the perforation lines and folded, resulting in three separate and complete booklets after trimming. Indeed, as will be noted hereinafter, there is evidence that the three individual booklets, which were mailed in an envelope by FCL prior to the three-in-one format, were prepared in this fashion, although it is not clear whether the plurality of layers was glued prior to parallel folding or stapled after separation.

The first right angle section of Model 433 contains three fold plates, # # 5, 6, and 7. Plates # # 5 and 7 are up plates, and plate # 6 is a down plate. Claim 1(e) states that each booklet panel is to be folded "along its centerfold line [backbone] . . . in a direction opposite the direction of folding of each adjacent panel." This is clearly a zig-zag or up-down-up fold consistent with the use of up plate # 5 and down plate # 6, which are the only plates in the first right angle specified in the 36-page format Impositions # 130 and # 131. After the folding along the centerlines or spines, no further folding would be necessary if the booklets were to be separated, trimmed, and mailed separately or in an envelope. However, Claim 1(g) provides that the booklets shall be folded along the lines of perforations joining them together, "the direction of folding of each of said panels along said lines of perforation being in a direction opposite the direction of the next adjacent line of perforations, the order of folding of the web being *first along said lines of perforations* to bring said centerfold lines into alignment with each other and *then along said centerfold lines,* to bring said panels into a securely nested relationship." (Emphasis supplied.) In other words, the multilayer web is folded along the lines of perforation in an up and down, or over and under fashion resulting in a nine layer web of superimposed panels, four pages to each layer of the panel, or a 36-page book. All that remained was to fold at the centerlines which were already in alignment. By reason of the up and down fold along the lines of perforation, the direction of folding of

the booklets would inevitably be in a direction of folding opposite that of each adjacent booklet. This would be true in the case of a 36-page booklet which was to be stitched, whether the up plate # 8 or the down plate # 9 in the second right angle section was utilized. However, if the centerfolds of the booklets were already glued, then the up plate # 8 in Imposition # 131 of the Baumfolder Manual would have to be utilized, rather than the down plate # 9 in # 130. The Court concludes, therefore, that the three-in-one booklet which is the subject of the suit patent could be produced on a buckle folder machine, with the glue pot and roller modifications hereinafter discussed, utilizing plates # # 1, *3*, 5, 6, and 8 in a 36-page format rather than by utilizing plates # # 1, 2, 5, 6, and 8 as illustrated in Imposition # 131 in the Baumfolder Imposition Manual.

Actually only three relatively simple folding procedures are necessary. The first, the parallel folding using two up plates, is nothing more than the standard six-page fold described in the manual in Imposition # 3. The next folding is vertical along the perforation lines, and is an accordion fold similar to that shown in Imposition # 4 and utilizes an up fold and a down fold to bring the centerlines in juxtaposition. Finally we have an up fold along the superimposed centerfold lines, completing and nestling the three-in-one format.

The modifications of the buckle folding machinery are not complicated, but indeed obvious. The normal product of the buckle fold machine is a single book or booklet, or a signature for a book, a signature being a partial book which is stitched to other signatures to form a complete book. A single book or booklet requires a single spine or backbone at the centerfold. Multiple books or booklets each with its spine or backbone, if produced at the same time, will normally require multiple glue pots instead of one pot, although booklets can be produced initially joined head and bottom, utilizing a single glue pot for the common centerfold (a possibility suggested in the specifications of the suit patent, but not pertinent hereto).

Therefore, in order to prepare the glued sheet or web before parallel folding, three glue pots would be positioned at the head of the buckle folder to lay three vertical lines of glue along the sheet or web as it was introduced into the machine. Pl. Exh. 1, Figure 6, lines 10, 12, and 14. Furthermore, for a cleaner operation, it is advisable to place three grooves (in the case of three booklets) in the three parallel rollers where the rollers pass over the glued centerfolds of the three panels of the sheet (the panels being defined by the perforation lines in Figure 6, lines 11 and 13) to prevent squashing out the glue. Zudekoff testified that this total operation was done by City Printing, when they became printers for FCL, in about eight or nine hours, *i.e.*, two hours to remove and put back the rollers, six hours to cut the three grooves in three rollers, and a half hour to mount the additional glue pots.

Since the only difference between the three-in-one booklets and the 36-page format in the Imposition Manual is in the initial parallel fold, we turn to the claims of the suit patent only to find that the parallel folding of the web or sheet is nowhere defined in the claims. The claims are limited in claims 1(a) and 2(a) to "an elongated web of printable material comprising a plurality of layers" which under claims 1(f) and 2(f) are "permanently bound to each other along the centerfold line of each panel." The manner of achieving the initial plurality of layers is nowhere defined in the claims. It is only when we look to the specifications, Figures 6 and 7, that we discover the manner in which a plurality of layers may be, and indeed was, achieved. However, the fold disclosed in the specifications is a suggested, not a mandated fold. The specifications describe the integral sheet before parallel folding as one "which *may* be used to produce the embodiment of the invention shown in Figs. 1, 3, and 5." Pl. Exh. 1, at 3 (emphasis supplied).

 It is a fundamental rule of patent law that the scope of protection granted by a patent is defined by the language of its claims rather than by its title, specifications, exhibits or by the commercial embodiments of the claimed invention. It is the "claims which define the boundaries of a patent monopoly." *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., supra*, 340 U.S. at 149, 71 S.Ct. at 128. However, it is also true that "[w]hile the claims of a patent limit the invention, and specifications cannot be utilized to expand the patent monopoly, . . . it is fundamental that claims are to be construed in light of the specifications and both are to be read with a view to ascertaining the invention." *United States v. Adams*, 383 U.S. 39, 48–49, 86 S.Ct. 708, 712, 15 L.Ed.2d 572 (1966) (citations omitted). Nevertheless, where the claim language is clear, it controls and may not be limited or distorted by resort to specifications, title, or drawings. *Id.* Although an element of the total invention may be illustrated by a drawing, this will not suffice where there is an entire absence of description or a failure to claim it. *Permutit Co. v. Graver Corp.*, 284 U.S. 52, 60, 52 S.Ct. 53, 55, 76 L.Ed. 163 (1931). Certainly the parallel fold, which we have previously identified as the standard six-page fold, Def. Exh. K–3, Imposition # 4, is not an element which Volk can utilize to distinguish his invention from the prior art. *Foxboro Co. v. Taylor Instrument Cos.*, 157 F.2d 226, 232–33 (2d Cir. 1946), *cert. denied*, 329 U.S. 800, 67 S.Ct. 494, 91 L.Ed. 684 (1947).

At trial, four distinct formats that have been manufactured on buckle folding machines were discussed and identified. The first was the three-in-one format described and claimed in the suit patent and, according to testimony at trial, was developed for the first time in early 1970. Pl. Exhs. 21–A, 47, 50. The second was the modified three-in-one format which was developed by City Printing for FCL and was first utilized in September 1976. Pl. Exhs. 46 and 48. The third is referred to as three individual 12-page booklets, the predecessor of the three-in-one format claimed in the suit patent, and testimony at trial established that this format of three separated booklets has been manufactured on buckle folding machines for forty years. Pl. Exhs.

46 and 49. The fourth is referred to as a 36-page book or signature and has been known in the printing and bindery field for about forty years. Defendant's Exhibit TT–1 is a 36-page signature comprising the first 18 and last 18 pages of a 48-page booklet. Defendant's Exhibit TT–3 is a 12-page signature which, when folded and nested into TT–1, creates the completed booklet. Def. Exh. TT–2. Plaintiff's Exhibits 52 and 53 illustrate the 36-page impositions in the Baumfolder Imposition Manual, Impositions # 131 and # 130 respectively. Each of these four impositions or formats use what is referred to in the bindery field as a 36-page bookfold which was identified by Damato, FCL's bindery expert, as having been in use in the bindery art for at least forty years.

By way of summation, the printing layout is designed so that when the paper is folded, cut, glued, etc., the pages will lie in a proper sequence and position. The particular imposition chosen is determined by the specific type of book or signature that will ultimately be produced by the buckle folder. A 36-page bookfold imposition layout is the starting point for the 36-page bookfold and, hence, for each of the four formats referred to above, including the 36-page book or signature, the series of three 12-page booklets, *and* the patented three-in-one format developed by Randolph Lyon in 1970.

(b) *The difference between the prior art and the claims at issue*

There are no material differences between the claimed invention and the prior art. The only difference between three 12-page booklets and a three-in-one format is that the former requires a full cut where the latter requires a perforation and folding. In this way, the three booklets are separated on the cutting wheel at the time of production, whereas the three-in-one format allows the booklets to be mailed as a unit and torn apart after receipt. For both

processes, the glue or paste pots, as well as the perforating and cutting wheels, are placed in identical positions. Then, after its slit scoring, the three-in-one format requires a simple extra step of folding along the perforations. According to FCL's expert, Damato, however, there is no difference between the accordion or wraparound folding of the three-in-one format and the folding used to manufacture a 36-page book or signature from the 36-page imposition, a process that has been employed for at least forty years.[5] Moreover, the features of the three-in-one format drawn from the production of 12-page booklets or 36-page signatures function in the identical manner as they did in the prior art.

The fact that the panels were detachable along the lines of perforations is not novel, and the use of perforations to separate pages or a plurality of layers is found in Phillips et al., Def. Exh. II; A.A. Johnson, Patent No. 2,136,343, Def. Exh. AA; D.J. Johnson, Patent No. 2,143,625, Def. Exh. BB; E.W. Cooper, Patent No. 1,350,785, Def. Exh. CC; H.P. Brown, Patent No. 1,738,633, Def. Exh. DD; and L.M. Snyder, Patent No. 1,904,650, Def. Exh. EE. Each of FCL's experts, Damato and Zudekoff, testified that perforations had been placed in 36-page booklets prior to 1969 to let air escape from the folded pages and that the perforations were in the same position as in the three-in-one format.

Furthermore, besides confirming all of Damato's testimony, Zudekoff also noted that self-mailers were known in the bindery art prior to 1969. See, *e.g.*, Swanson and Ewen Patents, Def. Exhs. KK and MM respectively. During the prosecution of the suit patent, the examiner placed great reliance on Swanson Patent No. 1,567,875, which illustrates the presence in the art as of 1925 of a self-mailer that is folded in a zig-zag or accordion fashion and then folded again along a centerfold to define nesting

5. The fact that the parallel folds may have differed from the folds in the 36-page formats in the Baumfolder Imposition Manual is immaterial. We are concerned with the folding recited in the claims. As we have heretofore developed, the initial folding was not claimed. Moreover, even if the initial parallel folds had been claimed, they were obvious to anyone skilled in the art.

panels in the identical manner that this feature is recited in the suit patent. Additionally, as noted above, when in 1969 Boardman instigated the development of a new format, he defined the problem as one of providing a self-mailer, thereby eliminating the need to insert three booklets into one envelope, and at trial Lyon acknowledged that the individual 12-page booklets easily could have been addressed and stamped to form a "self-mailer."

Thus, each and every element of the claims of the suit patent—the precise folding arrangement, the precise nesting relationship, the fields for printing, the positioning of the adhesive on the centerfold of the panels, and the identical locations of the perforations—has been present in products manufactured during the last forty years utilizing the 36-page imposition. Simply stated, in 1970, Lyon designed a three-in-one self-mailer that used no feature that was not then present and not then being used in the production of 36-page books or 12-page booklets on a buckle folding machine. Furthermore, the precise combination of features defined in the claims of the suit patent had been used in an identical manner in the bindery and printing field prior to 1970. The claims of the suit patent recite nothing more than a combination of old elements that perform in the same manner as they performed in the prior art with no unexpected changes or unexpected benefits resulting therefrom.

(c) *The level of ordinary skill in the pertinent art*

At trial FCL's experts Zudekoff and Damato testified as to the level of skill in the bindery and printing art in 1969. The Court finds that level of skill was high and employed sophisticated machinery. As discussed above, Zudekoff testified that there is nothing new or different in the three-in-one format from standard practices and procedures used in the bindery art in 1969 and that the three-in-one format does not provide a surprising result but rather was representative of a design expedient in the printing and bindery field. Tr. at 399. It

was his opinion that the three-in-one format was not patentable, was not "invented" by Lyon, but had been present in the trade for many years before 1969. Damato clearly demonstrated that individual 12-page booklets, identical in construction to the individual booklets manufactured by Volk for FCL prior to the adoption of the three-in-one format, were manufactured using a 36-page bookfold for at least thirty years prior to Lyon's development of the three-in-one mailer.

Lyon, the inventor, testified that he had never seen a 36-page bookfold prior to 1969, Tr. at 282, although both Volk's and FCL's bindery and printing experts testified that 36-page bookfolds have been known and used in the bindery art for close to forty years. Lyon had been in Volk's employ for four years in 1969 as plant manager, when he became product development manager. He had been in the printing business for nearly thirty years. His testimony that he had never seen a 36-page bookfold is difficult to accept.

Furthermore, in 1969 Volk had a Baumfolder and a Cleveland buckle folder at its facility, and it was while Lyon was at the Volk plant that the idea for the three-in-one booklet struck him. Tr. at 197. It may be true that he did not use a buckle folder but rather a razor and ruler to prepare the mock-up, but he had no doubt at that time that the booklets could be produced with some modifications on machinery that Volk then had. Tr. at 204. These modifications related primarily to the hot glue system and were made after the original mock-up was prepared. Volk used the Baumfolder machine in manufacturing the original separate booklets but switched to a larger machine, the Cleveland OO, to make the three-in-one booklets. Lyon admitted having seen many of the instruction books furnished with the Baumfolder, showing how to impose pages and how to fold, and was certainly no stranger to the prior art in 1969.

■ Volk's expert George Lawrence became aware of the buckle folding machinery in 1947, Tr. at 568, and saw a 36-page

book and three individual 12-page self-cover booklets manufactured prior to 1969 on a buckle folding machine. Tr. at 577. The Court concludes that the three-in-one format as defined in the claims of the suit patent, when taken as a "whole" would clearly have been obvious to a person of ordinary skill in the art in 1969.

### A.2. Late Claiming

■ Even were the claims of the suit patent not obvious, such claims are invalid under 35 U.S.C. § 102(b) for late claiming. Although the original article claims 1 through 5 are already set forth in the discussion of the file history, *supra*, they will again be set forth for the convenience of the reader.

The original article claims presented on March 19, 1971 were as follows:

1. An article of manufacture comprising folding multiple booklets, independently separably joined along the edges of the pages of those booklets lying adjacent and intermediate to the end booklets.

2. The invention of claim 1 where the multiple booklets are separably joined along lines parallel to the centerfold lines of said booklets.

3. The invention of claim 1 where the multiple booklets are separably joined along lines perpendicular to the centerfold lines of said booklets.

4. The invention of claim 1 where said multiple booklets are made independently separable by means of slit perforations.

5. An article of manufacture comprising folding multiple booklets, independently separably joined along the edges of the pages lying adjacent to each other. Pl. Exh. 1–B.

These original article claims were directed to folding multiple booklets (not folded multiple booklets), independently separably joined along the edges of the pages of those booklets lying adjacent and intermediate to the end booklets. They do not define a manner of folding paper to form booklets and instead are broadly directed to interconnected booklets. It is clear from reading the original article claims 1 through 5 that no thought whatsoever was given to the precise direction of folding of each of the panels along the lines of perforation, the nesting of those panels, the binding of the layers along a centerfold, and many other features such as mailability that were later claimed during the prosecution of the suit patent.

In determining the issue of late claiming, we turn to 35 U.S.C. § 102(b) which states:

A person shall be entitled to a patent unless—

. . . .

(b) the invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

However, under § 102(b) the "date of the application for patent in the United States" is not necessarily the date when the initial patent application was filed. Rather it is when the invention which ultimately resulted in the issuance of the patent was first disclosed in the Patent Office proceedings.[6]

The original article claims were presented on March 19, 1971. On April 18, 1972, the Patent Office rejected all of the article and process claims as vague and indefinite under 35 U.S.C. § 112 and as anticipated under § 102. This led to the filing of the first amendment on June 26, 1972, well over the one-year statutory requirement, indeed more than two years, after the commercialization of the Volk "invention" by FCL. This amendment cancelled the original claims and added four article claims, 9 through 12, which read as follows:

—9. As an article of manufacture, a plurality of folding booklets comprising:

(a) an elongated web of printable material comprising a plurality of layers,

---

**6.** An applicant cannot expand his application by amendment so as to embrace an invention not described in the application as filed when adverse rights of the public have intervened. *Schriber-Schroth Co. v. Cleveland Trust Co.*, 305 U.S. 47, 59 S.Ct. 8, 83 L.Ed. 34 (1938); *Oelbaum v. Lovable Co.*, 211 F.Supp. 594, 602–03 (S.D.N.Y.1962), *aff'd*, 322 F.2d 1022 (2d Cir. 1963).

(b) said web being sub-divided into a plurality of booklet panels,

(c) each panel being detachably connected to each adjacent booklet panel along a line of perforations transverse to the longitudinal axis of the web,

(d) each booklet panel being folded at its center along a line transverse to the longitudinal axis of the web to define fields for printed matter in said panels adjacent to a centerfold line,

(e) the direction of folding of each panel along its centerfold line being in a direction opposite the direction of folding of each adjacent panel,

(f) each layer being bound to each adjacent layer at the centerfold line of each panel,

(g) the web being folded along said centerfold lines and said lines of perforations, the direction of folding of each of said panels along said lines of perforations being in a direction opposite the direction of folding of the next adjacent line of perforations, to bring said panels into a nested relationship.

—10. As an article of manufacture, a plurality of folding booklets comprising:

(a) an elongated web of printable material comprising a plurality of layers,

(b) said web being sub-divided into three booklet panels,

(c) each panel being detachably connected to each adjacent booklet panel along a line of perforations transverse to the longitudinal axis of the web,

(d) the panels so defined being folded along said lines of perforations, the direction of folding of each of said panels along said lines of perforations being in a direction opposite to the direction of folding of the panels along the next adjacent line of perforations to bring said panels into a superposed relationship,

(e) all of said superposed panels being folded along their common centerline to define fields of printed matter adjacent a centerfold line, said booklet panels being in nested relationship,

(f) the adjacent layers of each panel bound to each other along the folded centerline of each panel.

—11. The article of claim 11 wherein the perforations are slit perforations.

—12. The article of claim 11 wherein the adjacent layers are bound together along the centerlines of the booklet panels using hot melt glue.

Pl. Exh. 1–B.

As discussed in the file prosecution history, two further amendments were proposed, the first of which followed the examiner's final rejection of the application on August 28, 1972. This filing, made on January 2, 1973, sought to amend the preamble in claims 9 and 10 to adopt the "self-mailable" language nowhere mentioned in the amendment of June 26, 1972, and further to substitute the words "consisting of" for the word "comprising" in the transition clauses in claims 9 and 10. After the examiner refused to enter this amendment, the original application was abandoned in favor of a continuation application, filed on February 28, 1973, Pl. Exh. 1–A, which was preliminarily amended to contain the same claim language contained in the January 2, 1973 amendment. Following the examiner's rejection of the continuation application's claims, plaintiff filed on November 9, 1973 a second amendment limited to the following: the addition of the word "permanently" in claims 9(f) and 10(f); the addition of the words "by two lines of perforations transverse of the web" in claim 10(b); the addition of the words "transverse of the web" in claim 10(e); and the change of the words "a centerfold line" to "the centerfold line" and the words "adjacent layers" to "subadjacent layers" in claim 10(f).

The suit patent herein did not issue from the original application but rather from the Patent Office Appeal Board's reversal of the examiner's rejection of the continuation application filed on February 28, 1973. For Volk to retain entitlement to the date of the parent application, i.e., March 19, 1971, it had the burden of proving compliance with 35 U.S.C. § 120. *Frantz Mfg. Co. v. Phenix Mfg. Co.*, 457 F.2d 314, 323 (7th Cir.

1972); *Federal Sign & Signal Corp. v. Bangor Punta Operations, Inc.*, 357 F.Supp. 1222, 1237 (S.D.N.Y. 1973). The statute provides as follows:

§ 120. Benefit of earlier filing date in the United States

An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States by the same inventor shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application.

In order for a continuation application to capture the filing date of the earlier parent application, the parent application must have disclosed an invention "in the manner provided by the first paragraph of section 112 ...." 35 U.S.C. § 120. The first paragraph of § 112 reads as follows:

§ 112. Specification

The specification *shall* contain a *written* description of the invention, and of the manner and process of making and using it, *in such full, clear, concise, and exact terms as to enable any person skilled in the art* to which it pertains, or with which it is most nearly connected, *to make and use the same*, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

(Emphasis added.) In the instant case, however, the original material and method claims were all rejected for failure to comply with § 112. As stated by the examiner in rejecting the material claims:

The disclosure is objected to as inadequate for a proper understanding of application's contribution, and lacks the fullness, clearness, and conciseness necessary to enable one skilled in the art to make and use the same, as required by 35 U.S.C. § 112.

Pl. Exh. 1–B, Paper No. 7. In other words, no invention was legally disclosed in the original specification. Whether the examiner was correct in so finding does not concern the Court since Volk accepted that finding. In any event, the Court reaches the same conclusion as the examiner's.

Since the prior date is determined not by the date the invention was claimed, but rather by the date when it was first disclosed in an application, this could not have been prior to the amendment application filed on June 26, 1972, more than two years after the three-in-one booklet had been on sale.

Even had the invention been disclosed in the original application, Volk is faced with the burden of showing that the invention disclosed in the continuation application can be construed as essentially the same as the invention disclosed in the original application.

Defendant's patent expert witness, a former Commissioner of Patents, testified that the following underscored limitations in the suit patent claims 1 and 2 (claims 9 and 10 of the continuation application) have no counterpart in article claims 1 through 5, as originally presented.

1. As an article of manufacture, a plurality of folding booklets *forming a self-mailable unit consisting of*

a. *an elongated web of printable material comprising a plurality of layers,*

b. *said web being sub-divided* along lines of perforations transverse of the web into a plurality of booklet panels *each being of the same size,*

c. each layer of each panel being detachably connected to a layer of each adjacent booklet panel along the line of perforations,

d. each booklet panel being folded at its center along a line transverse to the longitudinal axis of the web *to define fields for printed matter in said panels adjacent to a centerfold line,*

e. *the direction of folding of each panel along its centerfold line being in a direction opposite the direction of folding of each adjacent panel,*

f. *each layer being permanently bound to each subadjacent layer along the centerfold line of each panel so that upon detachment of said booklet panels from adjacent booklet panels* a plurality of independent booklets is provided *each having a number of pages which are permanently bound together along the centerfold line of the panels,*

g. *the web being folded along said centerfold lines* and said lines of perforations, *the direction of folding of each of said panels along said lines of perforation being in a direction opposite the direction of folding of the next adjacent line of perforations, the order of folding of the web being first along said lines of perforations to bring said centerfold lines into alignment with each other and then along said centerfold lines, to bring said panels into a securely nested relationship.*

2. As an article of manufacture, a plurality of folding booklets *forming a self-mailable unit consisting of* :

a. *an elongated web of printable material comprising a plurality of layers,*

b. said web being sub-divided by two lines of perforations transverse of the web *into three booklet panels each being of the same size,*

c. each layer of each panel being detachably connected to a layer of each adjacent booklet panel along the line of perforations,

d. *the panels so defined being folded along said lines of perforations, the direction of folding of each of said panels along said lines of perforations being in a direction opposite to the direction of folding of the panels along the next adjacent line of perforations to bring said panels into a superposed relationship,*

e. *all of said superposed panels being folded transverse of the web along their common centerline to define fields of printed matter adjacent the centerfold line, said booklet panels being in a securely nested relationship,*

f. *the sub-adjacent layers of each panel being permanently bound to each other along the folded centerline of each panel,* so that upon detachment of said booklet panels from adjacent booklet panels a plurality of independent booklets are provided *each booklet having a number of pages which are permanently bound together along the centerfold line of the panel.*

The magnitude of the changes made in the material claims on and after cancellation of the initial claims which culminated in the claims of the suit patent is such as to require serious consideration. It is true that the invention claimed in the continuation does not have to be described in the original or parent application *in ipsis verbis* in order to satisfy the description requirement of § 112. As stated in *Wagoner v. Barger*, 463 F.2d 1377, 1380 (C.C.P.A.1972):

> The question in cases in which the parent application does *not* contain language contained in the claims of the later application is whether the language which *is* contained in the parent application is the legal equivalent of the claim language, in the sense that the "*necessary and only reasonable* construction to be given the disclosure [in the parent application] by one skilled in the art," . . . is the same as the construction which such person would give the language in the claims of the later application.

(Emphasis in original; citation omitted.)

The Court can only conclude that the language contained in the parent application is not the legal equivalent of the language contained in the continuation application. An applicant cannot expand his application by amendment so as to embrace an invention not described in the application as filed when adverse rights of the public have intervened. *Muncie Gear Works, Inc. v. Outboard Marine & Mfg. Co.*, 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171 (1942) ("*Muncie*"); *Schriber-Schroth Co. v. Cleveland Trust Co.*, 305 U.S. 47, 59 S.Ct. 8, 83 L.Ed. 34 (1938); *Railway Co. v. Sayles*, 97 U.S. (7 Otto) 554, 24 L.Ed. 1053 (1878). This does not mean that an applicant may

not amend or add claims during the pendency of his application in the Patent Office, provided that the alterations and additions are supported by a reasonable interpretation of the original disclosure. Nor is the validity of the claims defeated by the fact that the claim is sought only after an intervening public use, so long as the original application contained a full disclosure of the invention finally claimed.

In *Muncie* the claims in suit related to a combination to reduce cavitation in outboard motors, consisting of an anti-cavitation plate, which alone was an old element, in conjunction with a streamlined housing for the engine and propeller shafts. The original patent application, filed over two years prior to the amendments containing the claims in suit, in no way suggested the combination ultimately asserted as the invention. The original claims were addressed to a deflection or anti-torque plate. No cross section of the housing was drawn or indicated, and from all that appeared from the drawing it might have been circular, triangular or rectangular. While the original specifications and drawings both indicated an anti-cavitation plate, it was in no way asserted that the cavitation plate was new, or that it was being employed in any novel cooperative relation to the other elements. The Supreme Court held that the amendments "for the first time made claims relating to the exterior surface of the housing," and thus changed the invention originally disclosed. *Muncie, supra,* 315 U.S. at 762, 62 S.Ct. at 866. Since there had been a public use and sale of devices embodying the asserted invention more than two years before such claims were presented, the Court held the claims invalid under Section 4886 of the Revised Statutes, the predecessor of 35 U.S.C. § 102(b).

It is also true that in determining the disclosure date of the invention it is proper to consider not only the original specification and claims, but also the drawings—as was done by the Court in *Muncie.* Indeed, in *Coats Loaders & Stackers Inc. v. Henderson,* 233 F.2d 915 (6th Cir. 1956), the court agreed with the lower court finding that the language of the specification and claim,

when read in the light of the very clear and full disclosure of the original drawings, made a complete disclosure of the claims in suit, and thus avoided the *Muncie* holding.

However, in the present suit we have the examiner's finding, in which this Court concurs, that the parent application failed to comply with the first paragraph of 35 U.S.C. § 112. Therefore, there was not adequate disclosure of the invention under § 120. We are not dealing with a situation in which the original application adequately met the requirements of the first paragraph of § 112; it was rejected in whole or in part under §§ 102, 103 and 112.

FCL places great reliance on a prior decision of this Court, *Kahn v. Dynamics Corp. of America,* 367 F.Supp. 63 (S.D.N.Y.1973), aff'd, 508 F.2d 939 (2d Cir.), cert. denied, 421 U.S. 930, 95 S.Ct. 1657, 44 L.Ed.2d 88 (1975) ("*Kahn*"). Volk, in turn, has devoted almost its entire trial memo and small portions of its post-trial and reply memos to an attack on this Court's failure in *Kahn* to apply 35 U.S.C. § 132, more particularly the final sentence of that statute.

35 U.S.C. § 132 reads as follows:

§ 132. Notice of rejection; reexamination

Whenever, on examination, any claim for a patent is rejected, or any objection or requirement made, the Commissioner shall notify the applicant thereof, stating the reasons for such rejection, or objection or requirement, together with such information and references as may be useful in judging of the propriety of continuing the prosecution of his application; and if after receiving such notice, the applicant persists in his claim for a patent, with or without amendment, the application shall be reexamined. No amendment shall introduce new matter into the disclosure of the invention.

Volk characterizes § 132 as an intervening statute between *Muncie,* decided in 1942, and *Kahn,* decided in 1973. However, § 132 replaced an earlier statute, Section 4903 of the Revised Statutes (also codified, in the 1946 edition, as 35 U.S.C. § 51) which

was repealed and replaced by 35 U.S.C. § 132 in July 1952, ten years after *Muncie.*

R.S. § 4903 or 35 U.S.C. § 51 read as follows:

§ 51. Notice of rejection of claim

Whenever, on examination, any claim for a patent is rejected, the commissioner shall notify the applicant thereof, giving him briefly the reasons for such rejection, together with such information and references as may be useful in judging of the propriety of renewing his application or of altering his specification; and if after receiving such notice, the applicant persists in his claim for a patent, with or without altering his specifications, the commissioner shall order a reexamination of the case.

No amendment for the first time presenting or asserting a claim which is the same as, or for substantially the same subject matter as, a claim of an issued patent may be made in any application unless such amendment is filed within one year from the date on which said patent was granted.

As may be observed the second paragraph of § 51 does not appear in § 132, having been placed in 35 U.S.C. § 135 dealing with interferences. It is the final sentence of § 132, added in July 1952, that Volk believes should have governed in *Kahn* and should govern here, *i.e.,* "No amendment shall introduce new matter into the disclosure of the invention." However, Volk does not dispute that this sentence represented no departure from the then practice. Plaintiff's Trial Brief at 16.

*Kahn,* of course, is distinguishable from the present case. In *Kahn* there was no rejection of the original disclosure of the invention. Presumably Kahn complied with the provisions of 35 U.S.C. § 120 when the continuation application was filed in that case. The claims which were charged to have been infringed first appeared by amendment made in the continuation proceeding and were not rejected. The Court found that even if the Kahn patent were not invalid as anticipated or obvious, the claims allegedly infringed were "invalid because no claims of a substantially similar scope were presented to the Patent Office— either in the original patent application filed July 3, 1953 and abandoned December 30, 1960, or in the continuation application as filed December 13, 1960—until more than one year after equipment substantially the same as that charged to infringe had been on sale and delivered to customers," 367 F.Supp. at 72, *citing Muncie* and *Chicopee Mfg. Corp. v. Kendall Co.,* 288 F.2d 719 (4th Cir.), *cert. denied,* 368 U.S. 825, 82 S.Ct. 44, 7 L.Ed.2d 29 (1961). In response to Kahn's argument that there had been no change in the drawings, except for an insignificant addition requested by the examiner, and, more importantly, that the claims sought on filing were much broader than those obtained on issue of the patent, the Court replied:

However, it is immaterial to the defense of late claiming whether or not the claims in suit were supported by the application as originally filed. The dispositive question is whether or not they are directed to essentially the same subject matter as claims originally presented. If they are not, but rather are directed to more specific subject matter which has been in public use or on sale more than one year prior to the presentation of these or substantially similar claims in the patent application, then it is immaterial that broad, unpatentable claims were presented in the application as originally filed. The applicability of the late-claiming defense is not dependent on whether the claims in issue are based on new matter added to the disclosure subsequent to the filing of the application, and is not rendered inapplicable because broader claims were present in the application as originally filed. Rather, *this defense relies on the fact that the claims are directed to subject matter not essentially the same as that originally claimed in the application,* and which indeed may be more specific and limited than those originally presented.

*Kahn v. Dynamics Corp. of America, supra,* 367 F.Supp. at 72 (emphasis added).

This Court adheres to the foregoing statement while recognizing that the specific language was not adopted by the Court of Appeals in its affirmance. The "new matter" which may not be introduced after rejection of a claim under § 132 is new matter introduced "into the disclosure of the invention." 35 U.S.C. § 132. Volk is not happy with the language of *Kahn* quoted above because it is applicable to and refutes certain arguments Volk raises to escape the late filing claim. In the initial application in the instant suit there was no valid disclosure to which new matter could be added. Volk, in the guise of an amendment, may have made a valid disclosure in June 26, 1972 but not before. Whether the amendment on that date satisfied the disclosure requirements of 35 U.S.C. § 112 is irrelevant. It should be noted, however, that the examiner's final rejection on August 28, 1972 of the original application as amended rejected claim 9 as incomplete or indefinite and claim 11 as indefinite or meaningless under 35 U.S.C. § 112 (although not necessarily under the first paragraph of § 112). Despite the Court's finding that there is a substantial difference between the original article claims and those of the suit patent, it prefers to rest its conclusion of invalidity primarily on the failure of the original Volk application to comply with the first paragraph of 35 U.S.C. § 112 and the resultant loss in the continuation application of the original filing date by virtue of 35 U.S.C. § 120.

Finally Volk argues that *Kahn* is contrary to public policy. Plaintiff's Trial Brief at 19–22. Whatever public policy is represented by *Kahn* is the public policy expressed in 35 U.S.C. § 102(b) and the prior statutes from which § 102(b) derives. The purpose of § 102(b) is to promote the public interest by requiring timely filing of patent applications in order to prevent a delay in filing the application from extending the limited monopoly period granted by the patent. More particularly, with respect to the present controversy, the purpose is to prevent an inventor from exploiting the secrets of his invention and subsequently seeking a legal monopoly only when confronted with the possibility of competition. The inventor must act with all due deliberate speed in filing his patent application. *Pennock v. Dialogue*, 27 U.S. (2 Pet.) 1, 7 L.Ed. 327 (1829); *Tri-Wall Containers Inc. v. Continental Can Co.*, 323 F.Supp. 700, 712 (S.D.N.Y.1971).

In the instant case it is not disputed that Volk disclosed the three-in-one booklet to FCL on March 26, 1970 and that copies were sold to FCL for the May 1970 publication thereafter. Yet no attempt was made by Lyon or Volk to patent the alleged invention until March 19, 1971, almost a year after disclosure to FCL, and then only because Volk had been discontinued as printer for FCL and FCL had taken the printing of the three-in-one booklet to another printer. The Court does not believe that the public policy involved in the instant suit merits further consideration.

### B. *Infringement Issues*

Assuming that the claims of the suit patent are not invalid for obviousness or for late-claiming, the sole infringement issue is whether file wrapper estoppel precludes Volk from asserting, under the doctrine of equivalents, that FCL's modified format infringes the suit patent. 35 U.S.C. § 271. FCL admits that the three-in-one booklet it used until September 1976 (the "original format"), which employed an accordion or zig-zag fold, met all of the limitations of all of the claims (1–4) of the suit patent. After receiving Volk's May 25, 1976 letter charging infringement, FCL adopted an over-and-over design—*i.e.*, a "C" or wraparound fold—to avoid the claims of the suit patent. FCL agrees that this pattern (the "modified format"), which it has used since September 1976 to the present date, meets all of the limitations of the suit patent's claims except one clause in paragraph (g) of claim 1 and the same clause in paragraph (d) of claim 2.

The modified format clearly does not *literally* infringe the claims of the suit patent. Limitation (g) of claim 1 and limitation (d) of claim 2 of the suit patent call for a zig-zag fold when they recite that

"[the] direction of folding of each of said panels along said lines of perforations being in a direction opposite the direction of folding of the next line of perforations . . . ." However, the doctrine of equivalents allows a patentee to capture a structure which does not literally infringe the claims of a patent where the structure performs substantially the same function in substantially the same way to achieve the same result. There would appear to be no question that the doctrine of equivalents would dictate a finding that the modified format infringes the original format.

■ Nevertheless, it is clear that a patentee may not avail himself of the doctrine of equivalents to expand the precise language in a claim—*i.e.*, to capture the fold adopted by FCL in the modified format—when the countervailing doctrine of file wrapper estoppel is applicable. *Capri Jewelry Inc. v. Hattie Carnegie Jewelry Enterprises Ltd.*, 539 F.2d 846 (2d Cir. 1976); *International Latex Corp. v. Warner Bros. Co.*, 276 F.2d 557 (2d Cir.), *cert. denied*, 364 U.S. 816, 81 S.Ct. 47, 5 L.Ed.2d 47 (1960). As stated in *Graham v. John Deere Co., supra*, 383 U.S. at 33, 86 S.Ct. at 701,

> It is, of course, well settled that an invention is construed not only in the light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office. *Hogg v. Emerson*, 11 How. 587 [52 U.S. 587, 13 L.Ed. 824] (1850); *Crawford v. Heysinger*, 123 U.S. 589 [8 S.Ct. 399, 31 L.Ed. 269] (1887). Claims as allowed must be read and interpreted with reference to rejected ones and to the state of the prior art; and claims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent. *Powers-Kennedy Co. v. Concrete Co.*, 282 U.S. 175, 185–186 [51 S.Ct. 95, 99, 75 L.Ed. 278] (1930); *Schriber Co. v. Cleveland Trust Co.*, 311 U.S. 211, 220–221 [61 S.Ct. 235, 239, 85 L.Ed. 132] (1940).

■ Once again the Court must reiterate that the file wrapper or prosecution history clearly establishes that all of the original article claims (1 through 5) were rejected on April 18, 1972 under 35 U.S.C. § 102 as being *anticipated* as well as for being vague and indefinite under 35 U.S.C. § 112. A patentee whose claims were rejected as unpatentable over the prior art and who thereafter amends his claims to restrict their scope and obtain their allowance is estopped to contend later that the claims should be interpreted as broadly as if the narrowing amendment had not been made. *Graham v. John Deere Co., supra*, 383 U.S. at 33–34, 86 S.Ct. at 701; *Exhibit Supply Co. v. Ace Patents Corp.*, 315 U.S. 126, 136, 62 S.Ct. 513, 518, 86 L.Ed. 736 (1942); *Cohn v. Coleco Indus. Inc.*, 558 F.2d 53, 58 (2d Cir. 1977). Moreover, an estoppel arises not only when existing claims are amended to add elements or limitations, but also where, as here, claims which have been rejected on prior art are cancelled (original claims 1 through 5), thereby leaving only narrower claims in the application. *I.T.S. Rubber Co. v. Essex Rubber Co.*, 272 U.S. 429, 443–44, 47 S.Ct. 136, 141, 71 L.Ed. 335 (1926); *Arco Indus. Corp. v. Chemcast Corp.*, 633 F.2d 435, 438–40 (6th Cir. 1980). In such a case, the claims remaining after amendment are compared with the cancelled claims, and the elements or limitations which appear in the remaining claims but not in the cancelled claims are critical to patentability. *Schmizzi v. Chrysler Corp.*, 462 F.Supp. 630, 634 (S.D.N.Y.1978).

Volk argues that file wrapper estoppel only occurs when a patentee seeks to have a court apply the doctrine of equivalents in such a way as to recapture for the patentee that which he or she gave up in the prosecution of the patent application because of the prior art, and not where the claims were narrowed in response to the examiner's rejection on the basis of indefiniteness under 35 U.S.C. § 112. Volk argues that the sole factual dispute regarding file wrapper estoppel is whether the "critical limitation" of paragraph (g) of claim 1 and paragraph (d) of claim 2—*i.e.*, zig-zag folding—distinguishes the claims of the suit patent from

the prior art. Plaintiff's Brief at 49. If so, then Volk is not estopped from asserting the doctrine of equivalents. Put succinctly, therefore, the Court must determine whether Volk's patent is restricted to an opposite fold, as dictated by a literal reading of the claim, or whether the patent extends to a same-direction fold, which would be equivalent to the fold in the suit patent.

Since we are speaking of file wrapper estoppel, we must look to the file wrapper for the answer. The clauses at issue are as follows:

1(g) the web being folded along said centerfold lines and said lines of perforations, the direction of folding of each of said panels along said lines of perforation being in a direction *opposite* the direction of folding of the next adjacent line of perforations, the order of folding of the web being first along said line of perforations to bring said centerfold lines into alignment with each other and then along said centerfold lines, to bring said panels into a securely nested relationship.

　　　*　　*　　*　　*　　*　　*

2 (d) the panels so defined being folded along said lines of perforations, the direction of folding of each of said panels along said lines of perforations being in a direction *opposite* to the direction of folding of the panels along the next adjacent line of perforations to bring said panels into a superposed relationship.

(Emphasis added.)

In connection with late claiming, we had occasion heretofore to discuss the April 18, 1972 rejection of the original application claims under 35 U.S.C. § 112 as too vague and indefinite to be understood, and under § 103 as being anticipated by the prior art, *i.e.*, the Cooper, Brown, and Snyder patents, each of which disclosed booklets separably joined together and folded in a zig-zag manner. By the time the suit patent reached the Patent Office Board of Appeals, § 112 was no longer a basis of rejection, the rejection on non-reference grounds only having been deemed overcome by the examiner. Pl. Exh. 1–A, Papers Nos. 5 and 8. Also, the rejection under § 103, as obvious and unpatentable over Cooper in view of Swanson or Fladmark, was withdrawn. *Id.* The primary issue on appeal was "whether or not the Phillips et al. patent discloses interconnected *booklets* each of which is formed by sheets of printable material secured together *along* a centerfold line of such sheets." *Id.*, Paper No. 12, at 3. When one considers the basis for the examiner's final rejection of the continuation application on August 20, 1973, *id.*, Paper No. 3, at 2–5; Volk's amendment filed on November 9, 1973, *id.*, Paper No. 4, which resulted in the examiner's withdrawing the rejection under § 103 of unpatentability over Cooper in view of Swanson or Fladmark, *id.*, Paper No. 8; and the definition by the Board of Appeals of the primary issue before it, *id.*, Paper No. 12, at 3, it is clear that the obviousness of the zig-zag fold had been cured by the amendments, indeed in great part by the amendment of the original application on June 26, 1972. Pl. Exh. 1–B, Paper No. 8–A.

As already noted, an estoppel can arise where, as here, claims which have been rejected on prior art are cancelled and new claims added, thereby leaving in the application only narrower claims. In such a case the claims remaining after cancellation and amendment are compared with the cancelled claims, and the elements or limitations which appear in the remaining claims but not in the cancelled claims are deemed critical as to patentability. *Schmizzi v. Chrysler Corp., supra*, 462 F.Supp. at 634. One has only to compare the original and amended claims to recognize that the direction of folding, and even the folding itself, was never set forth in the original claims and first appears after the rejection of the original claims, rejected not only as vague and indefinite under 35 U.S.C. § 112 but also as anticipated under 35 U.S.C. § 102, one of the references being to Cooper and the zig-zag fold. Additionally, the file wrapper discloses that, prior to submission of the amended claims, Volk's attorneys conferred with the examiner regarding the amended claims "submitted to distinguish the invention from the prior art

patents cited by the Examiner in the first rejection and to more clearly define the invention" and that "it was agreed that claims substantially in the form of claims 9 and 10 . . . would not read on the prior art of record and would cure all defects noted under 35 USC § 112." Pl. Exh. 1–B, Paper 8–A, at 4 and 5.

Volk is attempting to focus on what it characterizes as the "critical limitation" of paragraph (g) of claim 1 and paragraph (d) of claim 2, *i.e.*, the direction of folding along the lines of perforation. But we must look to the entire claim which makes it clear that the direction of folding along the lines of perforation is in conjunction with folding along the centerfold lines. As stated by the Patent Office Board of Appeals:

> The claims state that each web is subdivided into sheets which are permanently bound to each "sub-adjacent" sheet *along* a centerfold line thereof so that a plurality of independent booklets are provided. Booklets so formed in an endless web and separable along transverse perforation lines in such web in the manner recited in the claims are foreign to the disclosure of the Phillips patent.

Pl. Exh. 1–A, Paper No. 12, at 3 (emphasis in original). The fact that Phillips et al. discloses a plurality of multi-layered panels folded in zig-zag fashion was nowhere mentioned by the Board of Appeals.

In addition to the language in the amendment dated June 26, 1972 prescribing an accordion or zig-zag fold, a second substantive narrowing of the claims occurred when the amendment of January 2, 1973 submitted after final rejection of the original application, changed the word "comprising" to "consisting of" in claims 9 and 10. Although the examiner did not accept these amendments, they were carried over into the continuation application. The term "consisting of" makes it clear that the self-mailable unit in question involves the enumerated elements and only those enumerated elements specifically recited. Utilizing the term "consisting of" in the transition clause of a claim amounts to drafting a "picture claim" which is readable on a very specific structure. *Deering Milliken Research Corp. v. Leesona Corp.*, 201 F.Supp. 776, 782 (E.D.N.Y.1962).

■ The substantial amendments Volk made in its patent application were of critical importance in its finally obtaining the issuance of the suit patent, and the Court therefore concludes that Volk is precluded by file wrapper estoppel from asserting that the modified three-in-one format infringes the claims of the suit patent under the doctrine of equivalents.

## C. *Equitable License*

In addition to counterclaiming for a declaratory judgment of invalidity and non-infringement of the suit patent, FCL has also sought a declaratory judgment that it has an equitable license to practice the invention of the three-in-one booklets described in the patent.

The premises that give rise to an implied license are, in reality, a specific application of the general doctrine of equitable estoppel. *Graham-White Sales Corp. v. Prime Mfg. Co.*, 237 F.Supp. 694 (E.D.Wis.1964), *aff'd per curiam*, 343 F.2d 534 (7th Cir. 1965). As the Supreme Court stated in *Dickerson v. Colgrove*, 100 U.S. 578, 580, 25 L.Ed. 618 (1879):

> The vital principle [of equitable estoppel] is that he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectation upon which he acted. Such a position is sternly forbidden. It involves fraud and falsehood and the law abhors both. This remedy is always so applied as to promote the ends of justice.

■ As a species of the general principle of estoppel, the doctrine of "shop right" has evolved in patent cases. It usually arises when an inventor causes an employer to proceed to use an invention, and not only fails to object to the use but stands by while permitting his employer to assume expenses and puts himself in a position

where it would be to the employer's detriment to relinquish further use of the invention. *Gate-Way Inc. v. Hillgren*, 82 F.Supp. 546 (S.D.Cal.1949), *aff'd per curiam*, 181 F.2d 1010 (9th Cir. 1950). *See also Gill v. United States*, 160 U.S. 426, 16 S.Ct. 322, 40 L.Ed. 480 (1896); *United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 53 S.Ct. 554, 77 L.Ed. 1114 (1933). However, a shop right is not restricted alone to the case of an employer, as the doctrine is only a phase of the broad doctrine of estoppel. *Hillgren, supra*, 82 F.Supp. at 555.

In *Hillgren*, the court found that the doctrine of shop right arises through permissive use of the invention and is broad enough to include a case of the permissive use by a person other than an employer. *Id.* at 546. This permissive-use concept is also the lynchpin of the doctrine of license by estoppel. The Supreme Court in *De Forest Radio Tel. Co. v. United States*, 273 U.S. 236, 47 S.Ct. 366, 71 L.Ed. 625 (1927), in discussing the elements required for a court to find license by estoppel stated:

> No formal granting of a license is necessary in order to give it effect. Any language used by the owner of the patent or any other conduct on his part exhibited to another, from which that other may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts, constitutes a license, and a defense to an action for tort.

*Id.* at 241. More specifically, the remedy of equitable estoppel, as defined in *Dickerson v. Colgrove, supra*, 100 U.S. at 580, turns on four essential elements: (1) *Ignorance* of the matter asserted on the part of the person claiming estoppel; (2) *Silence* by the other party where there is a duty to speak, amounting to a misrepresentation or concealment of a material fact; (3) *Reliance* on this misrepresentation or concealment by the party asserting estoppel; and (4) *Damages* resulting if the estoppel is denied. *Kierulff v. Metropolitan Stevedore Co.*, 315 F.2d 839, 842 (9th Cir. 1963).

To apply these tests to this case, the Court must review the history of the par-

ties' relations. As explained above, it was FCL which presented to Volk the problem of insertion and self-mailing, and, based upon FCL's description of the problem, Volk gained valuable information that would permit it to develop a product uniquely suited to FCL's needs. Because of their close relationship at the time, FCL communicated this specific information to Volk without reservation. Tr. at 152, 697–98. The parties had always worked together to solve FCL's problems. Tr. at 149. Had FCL known that it would later be subject to an action for patent infringement because of its explanation of its needs for a self-mailer to its associated printer, it is not likely that FCL would have disclosed this information to its supplier without obtaining a release from any subsequent liability or a license to practice the invention at a later time.

As demonstrated at trial, the relationship between Volk and FCL was not one in which creation of a patented invention was ever contemplated. Tr. at 152. Prior to 1970, the relationship between Volk and FCL was not strictly supplier and customer, *Lukens Steel Co. v. American Locomotive Co.*, 99 F.Supp. 442 (N.D.N.Y.1951), *aff'd*, 197 F.2d 939 (2d Cir. 1952), or manufacturer and distributor, *Graham-White Sales Corp., supra*, or contractor-contractee, *B.F. Gladding & Co. v. Scientific Anglers, Inc.*, 248 F.2d 483 (6th Cir. 1957). In fact, at trial Boardman characterized this relationship as almost like one between a lawyer and a client. Tr. at 152.

As their relationship developed over the years, the degree of FCL and Volk's cooperation clearly increased. *Lukens Steel, supra*. Thus, whatever the nature of their relations when they parted ways in 1970, FCL and Volk's relationship to each other had become unique and not easily categorized. *Graham-White Sales Corp. v. Prime Mfg. Co., supra*, 237 F.Supp. at 703.

In ruling in *Lukens Steel, supra*, that the defendant Alco was entitled to an irrevocable royalty-free license to use a patented design, the district court characterized the parties' business relationship as one in

which both sides made substantial contributions to the eventually successful engine design. As the court commented:

It is unnecessary to catalog the relationship with legal accuracy. . . .

It certainly was not a vendor and purchaser arrangement to which the rule of *caveat emptor* applies. Neither was it the formal relationship which exists between fiduciary and beneficiary, guardian and ward, or principal and agent. It appears in some respect to have some of the elements of a joint venture, but it is sufficient to say that it was a business relationship involving mutual confidence and mutual effort in which each party hoped to profit.

99 F.Supp. at 446.

As noted above, Lyon testified at trial that it took him several hours to solve FCL's problem by developing the three-in-one format to its completion. Tr. at 260. Volk admitted that *but for* Boardman's instigation there never would have been a three-in-one format. Tr. at 84. It was further established that, after Lyon spent several hours developing the three-in-one format, it was FCL that paid to print up five hundred units for a test mailing and a further fifty thousand units to test recipient approval, and it was FCL, *not Volk*, that decided to commercialize the three-in-one format. Moreover, Volk has been unsuccessful in finding any other third party to commercialize the three-in-one format. Tr. at 109.

*But for* FCL there would have been no problem and thus there would not have been Lyon's solution. *But for* FCL's testing and commercialization there would have been no commercialization of the three-in-one format, and it is unlikely that Volk would have sought patent protection directed thereto.

To place this issue in perspective, it should be noted that four separate events concerning the suit patent led up to the issuance thereof. The first event was the statement of the problem by FCL and its instigation of a solution by Volk. The second step was the development by Lyon

of a paper mock-up. The third step was the testing, evaluation and commercial adoption by FCL of the three-in-one format. The fourth step was the filing of a patent application *after* FCL's commercialization of the three-in-one format had demonstrated its need for the product. Thus, Volk's activities in each step of development followed and were caused by and resulted from FCL's initiative.

■ In light of the factual setting described, the Court now turns to the four legal requirements for estoppel: FCL's ignorance, Volk's silence amounting to a misrepresentation or concealment, FCL's reliance, and damages. First, there is not a shred of evidence that FCL had any knowledge of Lyon's or Volk's application for a patent until May 25, 1976, more than six months after its issuance and over five years after FCL had ceased to employ Volk and had taken the printing of the booklets to other printers.

Was Volk entitled to remain silent or was there a duty to speak which amounted to misrepresentation or concealment of a material fact? Clearly there was a duty to speak on Volk's part. Volk knew during the entire period that its application was pending in the Patent Office that FCL was appropriating the invention. In the petition to make the patent application "special," Lyon's supporting affidavit and that of Volk's Controller, both verified in December 1971, made it clear that Volk's invention was being practiced by a competing corporation (unnamed) on behalf of a former Volk customer (unnamed) and that the number of orders could exceed one million in the near future. Pl. Exh. 1–B, Papers Nos. 2 and 3. Moreover, at the time the relationship between Volk and FCL terminated, Volk told FCL to take its business elsewhere.

If Volk had notified FCL of its intention to file a patent application at any time prior to the filing of the patent application by Volk in 1971, but after the parties separated, FCL would have been able to negotiate a reasonable license based upon Volk's lack of certainty that a patent would later issue

and also based upon the hope that FCL might return as its customer. If Volk had notified FCL at any time earlier than the separation between the parties, FCL would have been treated by Volk as a valued customer and, hence, would clearly have had the opportunity to negotiate a favorable license based upon its considerable leverage as a customer. Had Volk notified FCL of its intention to obtain patent rights before FCL had ever commercialized the invention, FCL would not only have had the opportunity to negotiate a favorable license but also the opportunity to explore other formats. Moreover, under the circumstances, Volk had a duty promptly to notify FCL of its patent application even though no patent had as yet, and might never be, issued. *Kierulff v. Metropolitan Stevedore Co., supra*, 315 F.2d at 843; *Gill v. United States, supra*, 160 U.S. at 433, 16 S.Ct. at 325.

Finally, there is no question that FCL would suffer damages, if the patent were held valid and infringed, unless it is granted an equitable license to practice the invention. The non-negotiable royalties which Volk sought to impose upon FCL in May of 1976 would amount to $6,000 per month, assuming a monthly distribution of only 500,000 units, or some $60,000 per year. Over five and one-half years have elapsed since FCL was charged with infringement, so that at least $300,000 is the minimum involved. Moreover, Volk is asking for triple damages under 35 U.S.C. § 284 and an award of attorneys' fees under 35 U.S.C. § 285, so that FCL's potential liability is well in excess of one million dollars. The Court accordingly finds that, were the suit patent valid and infringed, FCL would be entitled to an equitable license to practice the invention.

D. *Award of Attorneys' Fees Under 35 U.S.C. § 285*

■ Both Volk and FCL seek recovery of attorneys' fees under § 285 which gives the Court discretionary authority in "exceptional cases" to "award reasonable attorney fees to the prevailing party." Since Volk is not "the prevailing party," the Court denies

its application and notes, parenthetically, that it does not concur in Volk's conclusion that the case would have been an "exceptional" one if it had prevailed.

With respect to FCL's application the Court must determine: (1) whether the case is "exceptional"; (2) whether the Court should exercise its discretionary authority, and, if it does, (3) the amount that represents a "reasonable" fee. *CTS Corp. v. Electro Materials Corp. of America*, 469 F.Supp. 801, 823 (S.D.N.Y.1979). *See Monolith Portland Midwest Co. v. Kaiser Aluminum & Chem. Corp.*, 407 F.2d 288, 294 (9th Cir. 1969).

If a patentee in an infringement suit is found to have committed fraud on the Patent Office, the case is deemed exceptional within the meaning of the statute. *Kramer v. Duralite Co.*, 514 F.2d 1076, 1077 (2d Cir.), *cert. denied*, 423 U.S. 927, 96 S.Ct. 275, 46 L.Ed.2d 255 (1975). "But conduct short of fraud and in excess of simple negligence is also an adequate foundation for deciding that a patent action is exceptional." *Monolith Portland, supra*, 407 F.2d at 294. Furthermore, when the court is convinced that the suit patent is so wholly devoid of substance that the patentee could not have had a bona fide belief in its validity in an infringement suit, the court must conclude that the suit is exceptional. *Indiana General Corp. v. Krystinel Corp.*, 297 F.Supp. 427, 449 (S.D.N.Y.1969), *aff'd*, 421 F.2d 1023 (2d Cir.), *cert. denied*, 398 U.S. 928, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970).

An applicant for a patent and the Patent Office are more fiduciaries than antagonists, and the applicant owes a duty of candor to the overburdened Patent Office in the ex parte prosecution of a patent application. The Patent Office, a fact-finding as well as an adjudicatory agency, is necessarily limited in the time permitted to ascertain the facts necessary to adjudge the patentable merits of each application. This is increasingly so when the applicant has applied for, and receives "special" or priority status, as in the case of Volk. The Patent Office must rely on applicants for many of the facts upon which its decisions are based. Accordingly, the highest stan-

dards of honesty and candor on the part of applicants are necessary, indeed essential, to a viable patent system. *Norton v. Curtiss*, 433 F.2d 779, 794 (C.C.P.A.1970); Rules of Practice in Patent Cases, 37 C.F.R. § 1.56. The Court is not prepared to declare the patent invalid for fraud but concludes, on the particular facts of the instant case, that there were at least misrepresentations made and a lack of candor in the prosecution of the patent which is evident from the file wrapper, the file prosecution history, and the admissions made by Volk during the course of the trial.

In the File Prosecution History, *supra*, the Court commented on Volk's supporting papers in the petition to make the original application "special." Included was an affidavit by Volk's Controller who claimed that one of the factors that permitted a successful bidder to supply FCL with three-in-one booklets at a lower price was "the unfair advantage of the efforts and investments made by the Assignee (Volk) in developing the instant invention." Pl. Exh. 1–B, Paper No. 3, at 4. Lyon admitted that this was not true. Expenses of approximately $1,289.99 have been established and Lyon testified there were other costs in modification of the buckle folding machinery, *i.e.*, the rollers and glue system, which would run the total amount to $7,500–$8,500. Lyon admitted that these modifications would have to have been made by the successful bidder. Furthermore, the rates charged by Volk were raised sufficiently over the period when it was producing the three-in-one booklet to have permitted it to absorb its costs in developing the new format.

However, what convinces this Court that the case is exceptional is Volk's failure to disclose to the Patent Office the existence of the 36-page folding format in the bookbinding trade at the time of the alleged invention. Although Lyon denied knowledge of that format in 1969, all of the other witnesses testifying as to the prior art, including Volk's expert, stated they had known of the 36-page format for many years before 1969. Lyon certainly was well aware of it before he filed his original application in March 1971 since the three-in-

one booklet had been manufactured on buckle folding machinery utilizing a 36-page bookfold for nearly a year at that time. Advised of the 36-page bookfold in the prior art it would have been well-nigh impossible for the Patent Office Board of Appeals to have found that "[t]he concept of making a self-mailable unit, consisting of folded booklets interconnected by tearable lines, in the manner recited in the claims, is found only in the instant disclosure." Pl. Exh. 1–A, Paper No. 12, at 4. *Kramer v. Duralite Co., supra*, 514 F.2d at 1077; *Kahn, supra*, 508 F.2d at 945; *CTS Corp. v. Electro Materials Corp. of America, supra*, 469 F.Supp. at 823–24.

Furthermore, it is difficult to conceive how Volk could have expected to succeed in this infringement suit. The Court believes it highly improbable that Volk intended to obtain a patent before FCL took its business elsewhere. There was no demand for the three-in-one booklet other than FCL's. Once Volk decided to apply for a patent, it had to proceed with haste. The booklet had been disclosed to FCL on March 26, 1970 and arguably was in public use if not on sale at that time. Accordingly, broad indefinite claims were made with the specifications drawn more to the method claims (later abandoned) than to the article claims (later abandoned and new claims added). Volk got to the Patent Office door in the nick of time, but it did not bring a cognizable invention along.

Finally, the Court wishes to disassociate itself from the improper attempt by FCL's attorneys to gain some measure of advantage because of the charitable or non-profit or religious status of FCL, a status which has no relevance to the issues or the relief to be granted. Since it has no relevance, the Court has given it no weight whatsoever. All litigants stand as equals before the Court, as to which I am sure FCL would wholeheartedly agree.

In cases such as this one, the Court believes the better practice is to resolve the amount of FCL's attorneys' fees prior to the entry of final judgment, and it will afford the parties an opportunity to agree on an amount. If an agreement is reached FCL is directed to submit a proposed form

**1088**

of judgment, including the agreed-upon amount for attorneys' fees in accordance with this opinion. If no agreement is reached before April 2, 1982, FCL is directed to serve and file on that date its fee application, containing affidavits supported by contemporaneous time records, and Volk may reply thereto on or before April 16, 1982.

*Conclusion*

The Court grants defendant judgment on its counterclaim, and Lyon Jr. U.S. Patent No. 3,920,267 for "Multiple Folding Booklets" is declared invalid. 35 U.S.C. §§ 102, 103.

The complaint, charging defendant with infringing the Lyon patent, is dismissed. Fed.R.Civ.P. 41(b).

The entry of final judgment will abide resolution of the attorneys' fees issue. Fed. R.Civ.P. 54(b).

These are the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

So Ordered.